# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SUZAN VANDERMARK, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 3:13-1467 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## <u>REPORT AND RECOMMENDATION</u>

Suzan Vandermark ("Vandermark") seeks review of an adverse decision on her applications for disability insurance and supplemental security income benefits under the Social Security Act.[1]

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision.  *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).  Neither

---

[1]    Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability. Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line.

can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

## II. Background

*A.    Personal*

Vandermark, born in 1961, had the misfortune to grow up in a dysfunctional family. Her parents were alcoholics. (T. 173). Her dad yelled; she was bullied by neighborhood kids; her uncle sexually abused her. (T. 173, 845).

Vandermark married in her 20's. Her spouse repeatedly "raped" her. (T. 845). After 7 years, she divorced, then subsequently married a Vietnam veteran who also was abusive. (*Id*.). That marriage turned out to be a "false wedding conducted by the person who married her." (*Id*). In 2008, she returned home to live with her brother, who also is abusive. (T. 844). She has no children. (T. 173).

From birth, Vandermark experienced grand mal and petit mal seizures, including five while driving. She does not drive anymore; her driver's licence has been suspended. She experiences migraine headaches about once a month.

Vandermark dropped out of high school her senior year and began working in restaurants. (T. 845). She has a long history of medical treatment for back problems. She originally experienced whiplash and muscle pulls in her back when she was "rear-ended by a tractor-trailer" in 1996. She kept working in the food service industry, but hurt herself again in 1998 when she fell at work while carrying food and fractured her sacrum. She received Workers' Compensation.

Vandermark continued to work, but took narcotic pain medication to help with pain. The medication made it hard to concentrate. In 2003, she was

involved in another motor vehicle accident.  In 2005, she "retired" from being a prep cook due to pain, inability to lift, stand and work with her arms and hands.

Vandermark had difficulty taking orders from men who she felt treated her differently because of gender.  She threw dishes in frustration.  A therapist told her she has post traumatic stress disorder related to men.  (T. 703).  In 2008, she took Lexapro and Klonopin for anxiety and Vicodin for low back pain.

Vandermark claims she can only sit for one or two minutes before having to change positions.  Her medications make her feel fatigued and in "nowhere land."  New York weather aggravates her "arthritis," but she has family assistance with daily activities.  Daily activities are limited due to pain.

There is much evidence of alcohol and prescription drug abuse, including an admission to a social worker that "[she] was not supposed to [use drugs and alcohol] due to her seizures" but sometimes "chas[ed] down phenobarbitol with three fingers of bourbon" and "borrowed" Valium from an unknown source to take with Vicodin to get a mellow feeling.  (T. 377).

B.     *Claim*

In October 2005, Vandermark applied for disability insurance benefits and supplemental security income benefits, claiming that she became unable to work as of August 15, 2005, (at age 44), due to "back pain from prior injury, epileptic seizures, and depression." (T. 97-98).

### III.   Commissioner's Decision

Vandermark's claim has received three evidentiary hearings before three administrative law judges.  The first, in March 2008, resulted in an unfavorable decision that she appealed unsuccessfully to the Appeals Council.  In a subsequent judicial review action, the Commissioner consented to a remand.

The matter was reassigned to a new administrative law judge, Elizabeth W. Koennecke ("ALJ Koennecke") for another evidentiary hearing. In September 2010, ALJ Koennecke issued a partially *favorable* decision. (T. 418-34). She found Vandermark disabled *as of May 19, 2010*, due to declining mental health and medical-vocational factors. (T. 431). She found that *prior to May 19, 2010*, however, Vandermark could perform alternative work, including jobs as an appointment clerk, telephone survey worker, and telephone solicitor. (T. 433).

Vandermark filed written exceptions to the unfavorable part of ALJ Koennecke's decision with the Appeals Council. In April 2012, upon consideration of Vandermark's objections, the Appeals Council remanded the matter again for a *de novo* determination of disability *before May 19, 2010*. (T. 1012-13).[2] The Appeals Council directed that, upon remand, a new administrative law judge:

> Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966).

(T. 994).

The Commissioner reassigned the matter to ALJ Robin L. Henrie ("ALJ Henrie"). Because the Appeals Council concurred with ALJ Koennecke's finding that Vandermark became disabled commencing May 19, 2010, the relevant time

---

[2]     The Appeals Council did not affirm ALJ Koennecke's decision for the period *preceding* May 19, 2010, because of discrepancies in ALJ Koennecke's residual functional capacity findings and also because a hypothetical question posed by ALJ Koennecke to an expert vocational witness was not consistent with ALJ Koennecke's residual functional capacity finding.

period at issue before ALJ Henrie was Vandermark's alleged onset date, August 15, 2005, through May 18, 2010. (T. 972, 1012). ALJ Henrie conducted an evidentiary hearing at which Vandermark and an impartial vocational expert ("VE"), John F. Hurst, M.S., testified. (T. 972, 1069-1128).

In a written decision on October 23, 2012, ALJ Henrie found that during the relevant period, Vandermark suffered from the following severe impairments: "degenerative disc disease of the lumbar spine, including lumbar spondylosis, facet disease and related discogenic and degenerative disorders; seizure disorder, by history; irritable bowel syndrome; migraine and other headaches; adjustment disorder with depressed mood; depression; and, anxiety." (T. 974-75) (internal citations omitted). These impairments reduced Vandermark's ability to engage in work-related activities such that her residual functional capacity was for only sedentary-to-light unskilled work with multiple limitations necessitated by her physical and mental impairments. (T. 977-78). In a lengthy articulation (referred to by ALJ Henrie as "detailed"), ALJ Henrie found Vandermark's residual functional capacity during the period at issue to be as stated in the note below.[3]

---

[3] ALJ Henrie's complete residual functional capacity is:

From the alleged onset date of August 15, 2005 to May 18, 2010, claimant had at least the residual functional capacity to perform the full range of sedentary to light, unskilled work, but such work could not have required:

Lifting more than 10 pounds at a time (with both arms held close to body), on more than an "occasional" basis (where "occasional" means from very little up to 1/3rd of the day);

Lifting and carrying lighter articles, weighing more than 10 pounds at a time (with both arms held close to the body), on more than an "occasional" basis;

Standing more than 15 minutes at a time or walking more than 20 minutes at a time, nor more than 6 total hours in an 8 hour work day;

(continued...)

VE Hurst testified that, based on Vandermark's residual functional capacity, she lacked capacity to perform her past relevant work as a prep cook. (T. 988). In VE Hurst's opinion, however, there was alternative and available

---

[3](...continued)
Sitting more than 10 minutes at one time, nor more than 6 total hours in an 8 hour work day;

Note: regarding standing/walking and sitting, to be as comfortable as possible, claimant requires the option to make all of the postural changes noted above (the "sit/stand" option), thus there must be an option to perform work duties while standing/walking or sitting;

Bending, twisting, or squatting;

Stooping on more than an "occasional" basis;

Work on the floor (e.g. kneeling, crawling, or crouching);

Climbing or descending full flights of stairs (but a few stairs up or down not precluded);

Overhead lifting or overhead reaching;

More than frequent reaching, continuous handling and continuous fingering;

Working around dangerous unprotected heights, machinery or chemicals;

Work at more than a low stress level, which means:

• a low production level (where VE classified all SGA jobs as low, average or high production),
• no working with the general public,
• only rare to occasional contact with supervisors and co-workers on the job, but still having the ability to respond appropriately to supervision, co-workers and typical work situations, and
• the ability to deal with only rare changes in a routine work setting;

Work at more than a low concentration level, which means the ability to be alert and attentive to (and to adequately perform) only unskilled work tasks;

Work at more than a low memory level, which means:

• the ability to understand, remember and carry out only "simple" instructions (where "simple" is defined as functioning at GED levels of only - Reasoning: 3 Math: 2 Language 2);
• the ability to remember and deal with only rare changes in the work instructions from week to week, and
• the ability to remember and use appropriate judgment in making only "simple" work related decisions.

(T. 977-78).

work Vandermark could perform, including (1) nut sorter, (2) touch-up screener, (3) semi-conductor bonder, (4) bakery worker, conveyor line (5) small parts assembler, and (6) medical assembler (plastics).  (T. 989).

ALJ Henrie accepted VE Hurst's testimony, and found Vandermark "not disabled."[4]  Consequently, Vandermark's applications for disability-based benefits were denied for the period ending on May 18, 2010.  (T. 990).

## IV.  Points of Alleged Error

Vandermark's brief proffers three points of error as follows:

1.	The RFC determination for the period at issue is not supported by substantial evidence;

    A.	Plaintiff has had the same mental impairments prior to May 19, 2010;

    B.	The ALJ's RFC determination concerning Plaintiff's mental impairments is not supported by substantial evidence; and

    C.	The ALJ failed to consider the global assessment of functioning scores;

2.	The Commissioner has not sustained her burden at Step 5; and

---

[4]	The Social Security Act provides that:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, . . .. For purposes of the preceding sentence . . . "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

3.    The ALJ erred by permitting telephonic testimony of the vocational expert.

(Dkt. No. 14).

# V.  First Point

## A.  *Argument and Response*

Vandermark contends that ALJ Henrie's *mental* residual functional capacity finding is not supported by substantial evidence. First she argues that Vandermark "suffered from the exact same impairments" prior to May 19, 2010, as she did on that date when ALJ Koennecke found her disabled. Her brief argues that "nothing magical" happened on that date to worsen Vandermark's mental status. Thus, if Vandermark was disabled as of May 19, 2010, she was disabled during the period under consideration by ALJ Henrie.

Second, her brief proffers a multi-faceted argument that ALJ Henrie overlooked or improperly weighed medical evidence. Third, she asserts that the residual functional capacity finding is unsupported by substantial evidence because ALJ Henrie failed to consider Vandermark's Global Assessment of Functioning ("GAF") scores.[5]

The Commissioner responds that *ALJ Koennecke's* finding of disability commencing only on May 19, 2010, is irrelevant; rather, the sole relevant inquiry in this case is whether substantial evidence supports *ALJ Henrie's* decision that Vandermark was not disabled prior to May 19, 2010. (Dkt. No. 16, p. 6). Next, the Commissioner maintains that ALJ Henrie's residual functional capacity assessment was "extremely limited" and "exceptionally nuanced," reflecting careful consideration and weighing of all medical evidence of record. (*Id.*, pp. 6-

---

[5]    See n. 7, *infra*.

9). Finally, the Commissioner maintains that ALJ Henries expressly discussed Vandermark's GAF scores. (*Id.*, p. 9 & n.1).

## B.    *Discussion*

As a threshold matter, one is hard-pressed to discern Vandermark's modal logic. Vandermark does not argue that her mental impairment during the period at issue was of such severity as to warrant a Step 3 finding of presumptive disability under the Commissioner's "Listings."[6] Absent that, ALJ Henrie was required to assess Vandermark's residual functional capacity. It is hard to conceive of a more favorable assessment of mental residual functional capacity than what ALJ Henrie articulated. She restricted Vandermark's capabilities to only low-exertion, unskilled jobs involving low stress, low concentration and low memory. She defined each category explicitly so that it was clear that Vandermark could work only at a low production level, have no exposure to the general public and only rare contact with supervisors and co-workers, deal only rarely with routine work setting and work instruction changes, carry out only simple instructions and make only simple decisions.

---

[6]    ALJ Henrie utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

When administrative adjudicators determine (at Step 2) that claimants have severe impairments, they next decide (at Step 3) whether those impairments are disabling under 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). There, the Commissioner publishes a series of impairments describing a variety of physical and mental conditions, indexed according to the body system affected. *Id.* Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

To challenge this favorable finding on any ground initially smacks more of rhetoric than substance. Nonetheless, Vandermark's arguments are advanced in good faith, have colorable merit, and deserve careful review.

1. Irrationality

Vandermark's resourceful first argument accepts ALJ Koennecke's determination that Vandermark was disabled due to mental impairments on May 19, 2010, but then argues that ALJ Henrie's finding that Vandermark was not disabled prior to that date is fatally flawed because the symptoms that prompted ALJ Koennecke to find disability as of May 19, 2010, existed *before* May 19, 2010. Ultimately, this is a backdoor challenge of ALJ Koennecke's finding, not ALJ Henrie's independent decision.

ALJ Henrie was tasked with making a *de novo* determination of disability for the discrete period commencing August, 2005, and ending May 18, 2010. She was not bound by any prior fact findings. As it turned out, both ALJ Henrie and ALJ Koennecke concurred that Vandermark was not disabled prior to May 19, 2010. But, even had they differed, a reviewing court could not automatically reverse either decision for lack of substantial evidence. Reasonable fact finders may evaluate evidence differently.

The question that this reviewing court can entertain is not whether ALJ Henrie's decision is illogical in relation to ALJ Koennecke's, but whether ALJ Henrie's decision is internally rational and supported by substantial evidence.

2. Substantial Evidence

During the relevant time period, Vandermark had mental impairments (*i.e.*, depression and anxiety). When assessing Vandermark's mental residual functional capacity during this period, ALJ Henrie painstakingly described in

eleven, single-spaced pages of her decision, the evidence of record, both medical and subjective, including testimony from all three hearings.

The only mental-impairment evidence that ALJ Henrie did not discuss or weigh were opinions provided by a staff psychiatrist (Dr. Mahfuzur Rahman, M.D.) and a mental health counselor (Sandra Westgate, LCSW), both with Broome County Community Mental Health Services. These evaluations were made *after* the period at issue. Ms. Westgate specifically noted that her assessment only covered the time period commencing August 11, 2010. (T. 900). Dr. Rahman's evaluation on May 19, 2010, only notes that her current symptoms *recently* became "extremely worse."

There is no legitimate basis, therefore, for the court to conclude that ALJ Henrie failed to consider all relevant evidence. When summarizing that evidence, ALJ Henrie did mistakenly state that Vandermark's GAF score upon admission to a hospital in May 2008 was 50-60 and upon discharge was 60. (T. 983). In actuality, it was 60 upon *admission* and 50-60 upon *discharge*, which might suggest deterioration. (T. 586, 590). This mistake is of no great consequence, however, because both scores indicated only moderate symptoms.[7]

### a. *Medical Evidence Regarding Mental Status*

ALJ Henrie did not assess Vandermark's mental residual functional capacity as severely as Vandermark advocates because she found "very little" objective evidence of Vandermark's mental health impairments during the

---

[7] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n. 1 (2d Cir. 2008) (citing AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS [DSM-IV] 32 (4th ed. 2000)). A GAF of 50-60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers)." *See* DSM-IV, at 34.

relevant period. (T. 981). Vandermark's brief cites instances in January, March, May and July, 2008 wherein she received diagnoses of mental abnormalities, and exhibited mood disorder, anxiety, depression, suicidal ideation and similar symptoms. Vandermark argues, therefore, that ALJ Henrie's impression of little objective evidence was patently incorrect.

The record before ALJ Henrie pertaining to the relevant period showed that she took antidepressant medication, including Lexapro and Klonopin in 2005. (T. 225). In January 2006, she underwent a mental status examination with consultative psychiatric examiner, Dr. Malcolm Graham, III, Ph.D. (T. 173-175A). Dr. Graham noted that Vandermark had no indication of depressed or anxious mood, and that she had appropriate affect. (T. 174). Additional findings upon mental status examination were benign. (T. 174-75). There were no problems noted in attention and concentration, nor in recent or remote memory. (T. 175). She reported having one prior contact with a mental health professional in the late 1990's or early 2000 because of sexual dysfunction. (T. 174). She also reported seeing a local psychiatrist, probably for depression, since then. (T. 175). Dr. Graham opined that Vandermark had dysthymia and possible alcohol abuse. (*Id*.). He assigned a global assessment of functioning score of 65-75, indicative of mild symptoms. (T. 982).

In January, 2008, Vandermark met with a social worker at the Syracuse Veterans Affairs medical center due to having had suicidal ideation over the weekend. (T. 377, 983). Vandermark denied having such thoughts currently. (T. 378). She reported that she had never seen a psychiatric practitioner, but her treating physicians were prescribing medication for anxiety. (*Id*.). She was preliminarily diagnosed with a mood disorder NOS. (*Id*.). In May 2008, Vandermark again visited the Syracuse Veterans Affairs medical center and reported feelings of sadness, depression, and suicidal ideation. (T. 570). She

reported being sad because she could not support herself and her brother was financially helping her. (*Id.*). She was overwhelmed with marital problems. (*Id.*). Vandermark was hospitalized then for one week for depression and suicidal ideation. (T. 983).

In July 2008, follow-up progress notes described Vandermark as "very buoyant and happy" at the visit. (T. 568). She reported that her medication change from Lexapro to Cymbalta "made a huge difference," and her moods were "more even." (*Id.*).

Vandermark's argument (that this evidence objectively demonstrates persistent severe mental health impairments throughout the period at issue) is cogent and not without force. Indeed, ALJ Henrie found that Vandermark has several severe mental impairments. It was within the bounds of sound discretion, however, for ALJ Henrie to conclude that there was little objective evidence of disabling and persistent mental health impairments given the essentially-negative evaluation of the consultative examiner and otherwise sparse, incidental and intermittent mental health records during the five years at issue, especially when the most serious incident, a brief hospitalization in May, 2008, resulted in a medication change that made a huge difference for the better. A reviewing court cannot reweigh that evidence *de novo* and come to a different conclusion.

### b. *Weighting of Medical Opinion*

The only medical source who expressed a forensic opinion regarding Vandermark's mental status was consultative examiner, Dr. Graham. According to Vandermark, Dr. Graham was the only person who conducted a mental status examination "without identifying any problems." Vandermark argues that ALJ

Henrie erred in not expressing what degree of weight she afforded to Dr. Graham's opinions. She further argues that Dr. Graham's opinions should have been afforded little or no weight because he was a consultative examiner who saw Vandermark only once. Finally, she argues that, in any event, ALJ Henrie erred by not testing or evaluating Dr. Graham's opinions in light of six regulatory factors prescribed in 20 C.F.R. § 1527(c).[8] Vandermark suggests, that without Dr. Graham's one-time evaluation, the only remaining evidence "demonstrates persistent severe mental health impairments throughout the period at issue here."

ALJ Henrie did not articulate findings on all six regulatory factors with respect to Dr. Graham's medical opinion, nor did she assign any specific degree of weight to Dr. Graham's assessment of Vandermark's mental status. The fact that a given factor was not expressly *mentioned*, however, does not mean necessarily that it was not *considered*.[9] To draw such a conclusion here would be especially inappropriate because ALJ Henrie expressly cited all relevant regulations and rulings concerning weighting of medical and other evidence (T. 986), thus documenting intent to apply correct legal principles.

In any event, courts do not require perfect opinions or rigid, formulaic applications of evaluative protocols prescribed by regulation. *See Atwater v.*

---

[8]     When controlling weight is not afforded to treating source opinion, or when other medical source opinion is evaluated with respect to severity of impairments and how they affect individuals' ability to function, the degree of weight to be given such evidence is determined by applying certain generic factors: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) evidence supporting the opinion; (4) how consistent opinion is with record as a whole; (5) specialization in contrast to condition being treated; and (6) other significant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c).

[9]     *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.").

*Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013) (summary order) ("no such slavish recitation of each and every factor [20 C.F.R. §§ 404.1527(c), 416.927(c)] [is required] where the ALJ's reasoning and adherence to the regulation are clear"); *see also Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004) (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed"). Reviewing courts are more concerned with whether administrative decisions reflect that the entire record was considered, whether substance of a prescribed analytical protocol was traversed, whether reasons underlying findings are expressed clearly enough for meaningful judicial review, and whether determinations are supported by substantial evidence. *See, e.g., Cichocki v. Astrue*, 729 F.3d 172, 177–78 (2d Cir. 2013) (declining to adopt a *per se* rule that failure to provide a prescribed function-by-function analysis of residual functional capacity is grounds for remand).[10] Hence, lack of a mechanical application of the factors prescribed in 20 C.F.R. §1527(c) is not a basis for an automatic reversal.

For the same reason, failure to express a specific quantum of weight afforded to Dr. Graham's forensic opinions does not constitute a reversible error. That might be important in some cases. But here, where there were no other forensic opinions against which to compare Dr. Graham's opinions, a specific-weight finding would have been superfluous.

---

[10]    *See also Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at *22 (E.D.N.Y. Aug. 14, 2012) and *Judelsohn v. Astrue*, No. 11-CV-388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012) (both declining to view a 7-factor analysis prescribed by regulation for assessing subjective credibility as a rigid prerequisite).

Finally, ALJ Henrie was not required, as a matter of law, to afford Dr. Graham's opinions little or no weight simply because he examined Vandermark only once in a consultative capacity. There is no *per se* error in choosing to weight consultative medical opinion over treating physician opinion. *See, e.g., Netter v. Astrue*, 272 Fed. App'x 54, 55-56 (2d Cir. 2008) (reports of consultative and/or non-examining physicians may override opinions of treating physicians, provided they are supported by substantial evidence in the record). ALJ Henrie was entitled to consider and even rely upon Dr. Graham's opinions because they were the *only* forensic opinions regarding Vandermark's mental capabilities in the record before ALJ Henrie.[11]

    c.    *GAF Scores*

Vandermark argues that her GAF scores within the time period at issue reflect that she has moderate symptoms and moderate difficulties in occupational functioning, and that this substantiates her claim that her mental condition "was similar if not identical both before and after May 19, 2013 [*sic* for 2010]." She then proffers that ALJ Henrie "failed to properly consider these low scores and the fact that Plaintiff continued to have similar scores both before and after May 19." Vandermark cites out-of-circuit cases for the proposition that GAF scores must be addressed when making determinations about claimants' alleged disabilities, and that failure to consider them warrants remand.[12]

---

[11]    The record contained evidence concerning Vandermark's mental status <u>after</u> the period at issue from Dr. Rahman and social worker Westgate, which properly was not considered.

[12]    Vandermark cites *Pate-Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009); *Wiggers v. Astrue*, No. 09-86, 2010 WL 1904015, at *8 (W.D. Pa. May 10, 2010); *Watson v. Astrue*, No. 08-1858, 2009 WL 678717, at *5 (E.D. Pa. Mar. 13, 2009).

ALJ Henrie specifically mentioned Vandermark's GAF scores both as assessed by Dr. Graham in 2006 and by staff at the Syracuse Veterans Administration Hospital during Vandermark's brief hospitalization in May, 2008. This is sufficient for a reviewing court to conclude that ALJ Henrie properly considered all of the evidence available to her. While ALJ rationally might have drawn inferences that Vandermark advocates, she was not compelled to. Indeed, since those scores demonstrated only mild to moderate symptoms, further consideration of GAF scores was not warranted.

In any event, while GAF scores may be relevant to a severity and residual functional capacity determinations,[13] administrative law judges need not explicitly mention them. *See Ortiz Torres v. Colvin*, 939 F. Supp.2d 172, 184 (N.D.N.Y. 2013) ("This Court rules that the hearing officer's failure to discuss the [GAF] scores does not constitute an error worthy of remand."); *Dwyer v. Astrue*, 800 F. Supp.2d 542, 548 (S.D.N.Y. 2011) (noting that "the ALJ's failure to mention [the claimant's] GAF of [fifty] is insufficient to conclude that she failed to consider it").

Careful review of Vandermark's first point of error fails to disclose a basis for concluding that ALJ Henrie's residual functional capacity assessment was not supported by substantial evidence.

## VI. Second Point

When Vandermark proved that her physical and mental impairments precluded her from performing her past relevant work, she established a *prima*

---

[13]     *See Parker-Grose*, 462 Fed. App'x 16, 17–18 (2d Cir. 2012) (summary order); *Ortiz Torres v. Colvin*, 939 F. Supp.2d 172, 184 (N.D.N.Y. 2013).

*facie* case of disability during the period at issue.[14]  Under sequential analysis (at Step 5), the burden then shifted to the Commissioner to produce evidence that an alternative job existed which Vandermark was capable of performing. *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)); *see also* 20 C.F.R. §§ 404.1560(c), 416.960(c).  Specifically, the Commissioner was required to show show that there were a *significant number* of jobs in the national economy that Vandermark could perform based on her residual functional capacity, age, education, and prior vocational experience.  *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1560, 416.960.[15]  "Courts have generally held that what constitutes a 'significant' number is fairly minimal."  *Fox v. Commissioner of Soc. Sec.*, No. 6:02–CV–1160 (FJS/RFT), 2009 WL 367628, at *20 (N.D.N.Y. Feb.13, 2009).[16]

---

[14]  *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984).

[15]  The Commissioner's regulations interpret this requirement as follows:

Work exists in the national economy where there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.

20 C.F.R. §§ 404.1566(b), 416.966(b).

[16]  *Haskins v. Commissioner of Soc. Sec.*, No. 5:05-CV-292 (DNH/RFT), 2008 WL 5113781, at 11 (N.D.N.Y. Nov. 25, 2008) (collecting cases, *e.g., Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (citing various cases such as *Trimiar v. Sullivan*, 966 F.2d 1326, 1330-32 (10th Cir. 1992) (850-1,000 potential jobs is a significant number of jobs), *Nix v. Sullivan*, 744 F. Supp. 855, 863 (N.D. Ind.), *aff'd*, 936 F.2d 575 (7th Cir. 1991) (675 jobs is a significant number), *Barker v. Secretary of Health & Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs is a significant number), *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs is a significant number), *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 jobs is a significant number), and *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs is a significant number)); *see also Johnson v. Chater*, 108 F.3d 178 (8th Cir. 1997) (200 jobs in entire State of Iowa and 10,000 nationally is a significant number); *Wright v. Chater*, 969 F. Supp. 143, 147-48 (W.D.N.Y. 1997) (1700 jobs in the Finger Lakes region is a significant number)).

To meet this evidentiary burden, administrative law judges "may use the services of a vocational expert or other specialist." *See* 20 C.F.R. §§ 404.1566(e), 416.966(e).[17] The vocational expert's role in such cases is to

> assess the effect of any limitation on the range of work at issue (e.g., the potential occupational base); advise whether the impaired person's RFC permits him or her to perform substantial numbers of occupations within the range of work at issue; identify jobs which are within the RFC, if they exist; and provide a statement of the incidence of such jobs in the region in which the person lives or in several regions of the country.

SSR 83–12, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK–THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING EXERTIONAL LIMITATIONS WITHIN A RANGE OF WORK OR BETWEEN RANGES OF WORK, 1983 WL 31253 at *3 (SSA 1983). When forming an opinion as to whether such jobs exist, a vocational expert may rely on information available from governmental and other publications, such as the *Dictionary of Occupational Titles* ("DOT").[18]

A.    *Expert Vocational Testimony*

ALJ Henrie consulted and elicited vocational expert testimony. In response to a hypothetical question listing all of Vandermark's limitations, VE Hurst identified several DOT jobs that, in his opinion, a person matching

---

[17]    In determining whether work exists in the national economy, the regulations provide:

> Use of vocational experts and other specialists. If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist. We will decide whether to use a vocational expert or other specialist.

20 C.F.R. §§ 404.1566(e), 416.966(e).

[18]    The DOT is a reference published by the U.S. Department of Labor that lists and describes various jobs. Its use in the disability review process is authorized by regulation. *See* 20 C.F.R. §§ 404.1566(d), 416.966(d).

Vandermark's age, education, and residual functional capacity could perform. (T. 1114-15). VE Hurst further testified that such jobs are available in significant numbers in the national economy.

Specifically, VE Hurst testified that such an individual would be able to perform the following *light* unskilled jobs: (1) medical assembler plastics, DOT 712.687-010, with 46,000 such jobs in the national economy; and (2) small parts assembler, DOT 706.684-022, with 450,000 such jobs in the national economy. (T. 1114). VE Hurst reduced these incidence numbers by 25% "not those due to the hypothetical." (*Id.*). VE Hurst also testified that an individual would be able to perform the following *sedentary* unskilled jobs: (1) touch up screener, DOT 726.684-110, with 110,000 such jobs in the national economy; and (2) semiconductor bonder, DOT 726.685-066, with 70,000 jobs in the national economy. VE Hurst reduced these job numbers by 20%, due to "limitations in the hypothetical." (T. 1114-15).

When ALJ Henrie slightly altered the hypothetical to reduce the math, language and reasoning factor down to a 1 on GED levels,[19] this ruled out all the earlier-identified jobs, but VE Hurst testified that there still would be a light, unskilled job available–bakery worker, conveyor line (DOT 524.687-022, with 42,000 jobs), and a sedentary, unskilled job as a nut sorter, (DOT 521,687, with 16,000 jobs) available in the national economy. VE Hurst again reduced the

---

[19]     Each job description in the DOT includes a definitional trailer that includes General Educational Development ("GED") levels rated between "1" and "6" pertaining to reasoning development, mathematical development, and language development. *See* Dictionary of Occupational Titles, Appendix C—Components of the Definitional Trailer, 1991 WL 688702 (4th ed. 1991). GED levels do not describe specific mental or skill requirements of a particular job, but rather describe the general educational background that makes an individual suitable for the job, broken into the divisions of Reasoning Development, Mathematical Development and Language Development. *See Anderson v. Colvin*, 514 Fed. App'x 756, 764 (10th Cir. 2013) (summary order).

number of these jobs by 20% stating "the same 20 percent reduction would hold true with these two jobs." (T. 1115).[20]

Under cross-examination, VE Hurst stated that the job-incidence numbers he gave did not reflect the actual number of positions available for each specific DOT job code (*e.g.*, small parts assembler = DOT 706.684-022) that he identified as an occupation a person with Vandermark's limitations could perform. Rather, those numbers applied to a much larger "Census Code" job group. For example, the DOT job code for small assembler was classified under Census Code 51-9199, which included 1,587 DOT job titles, small parts assembler being only one. VE Hurst readily agreed that 450,000 jobs do not exist for each of the 1,587 DOT job titles within that Census Code. (T. 1121). He acknowledged that because of those Census Codes groupings, "you have to factor out specific jobs." (*Id.*).

When asked for the methodology by which VE Hurst took total Census Code numbers and broke them down into numbers he gave on direct examination, VE Hurst responded that he derived them as a product of his own judgment formed after consulting several sources, a publication identified in the transcript as *"employment stats quarterly,"*[21] a computer program titled *"Job*

---

[20]    Ultimately, ALJ Henrie did not reduce Vandermark's residual functional capacity to a GED level 1 for math, language and reasoning. Hence, the overall effect of VE Hurst's testimony was that Vandermark can still perform six specific jobs, three in the light unskilled category, and three in the sedentary unskilled category.

[21]    Based on a review of jurisprudence dealing with similar issues, the undersigned deduces that "employment stats quarterly" probably refers to "Occupational Employment Quarterly" ("OEQ"), a commercial publication that employs government data to provide statistics regarding job numbers by census code, not by DOT code, in chosen geographical areas. Census codes are broader designations than DOT codes, and a single census code may comprise numerous DOT-coded occupations.

    A newer edition, "Occupational Employment Quarterly II 2.0" ("OEQII"), reports job numbers by standard occupational classification ("SOC") Codes, which like census codes, may comprise numerous DOT codes. A "crosswalk manual" allows users to determine DOT codes included in each SOC grouping. *See* Occupational Employment Quarterly II, available at http://www.uspublishing.net/oeqii_page.html (last visited on Jan. 6, 2015).

*Browser Pro,*"[22] unidentified "*source documents*" from the Department of Labor and the state's Employment Security Office and collaborative efforts with other vocational experts to come up with a reasonable number. (T. 1119-20). He then made adjustments twice a year, having recently lowered his numbers based on current high unemployment rates. (T. 1122). He could not recite or recalculate that formula, however, during the administrative hearing. (*Id.*).

## B.    *Argument & Response*

### 1.    Plaintiff's Argument

Vandermark claims that VE Hurst's testimony is so fraught with error that it does not provide substantial evidence supporting ALJ Henrie's Step 5 finding. First, Vandermark argues that VE Hurst's testimony is incredible on its face. Vandermark argues that when a person starts with diminished residual functional capacity for only sedentary work, and such capacity is further reduced by 21 additional limitations, "it is evident to a lay person that Plaintiff cannot work" once the combination of all limitations is considered.

Vandermark next argues that VE Hurst's testimony "was insufficient to support a finding that a significant number of jobs exist in the national economy that Plaintiff could do because the VE failed to specify the number of positions for each specific jobs (*sic*) that exist in the national, state and regional economy." Vandermark argues that this flaw was compounded further when VE Hurst "randomly" reduced the number of available jobs within the job titles he

---

[22]    According to the SkillTRAN website, "Job Browser Pro" is a software tool for "VE and Forensic Testimony" containing "an enormous amount of occupational and labor market information." It "features a . . . continuously peer-reviewed methodology to estimate DOT employment numbers using standard government data." *See* Job Browser Pro Version 1.6 by SkillTRAN, available at http://www.skilltran.com/jb_overview.htm (last visited on Jan. 6, 2015). In *Malone v. Astrue*, No. 3:10-cv-01137, 2011 WL 5879436, at *3 (M.D. Tenn. Nov. 23, 2011) SkillTRAN was described as having a methodology for reducing Occupational Employment Statistics ("OES") numbers based on frequency of DOT codes underneath the OES numbers by how they typically exist in the population using census numbers. *Id.*

identified by 20% to account for all of Vandermark's mental and physical limitations. Vandermark argues that VE Hurst could not (a) identify statistical studies supporting that reduction, or (b) articulate a scientific methodology by which he derived the percentage, or (c) base the percentage on "experience" because he had never placed a client in a "nut sorter" job, and possibly some other jobs he identified. Thus, it was impossible for VE Hurst to say or for the court to meaningfully review whether a 20% reduction "would actually accommodate the extremely restrictive limitations" in ALJ Henrie's residual functional capacity assessment.

Third, Vandermark argues that VE Hurst's testimony does not provide substantial evidence for ALJ Henrie's Step 5 finding because ALJ Henrie failed to pose all of Vandermark's actual limitations in the hypothetical question to which VE Hurst responded. Specifically, Vandermark contends that the hypothetical question was incomplete because if failed to account for her inability to respond appropriately to supervision, coworkers and work situations, inability to deal with changes in a routine work setting, and her likely decreased work pace and absenteeism. Vandermark refers to ALJ Koennecke's earlier mental-limitation findings as of May 19, 2010, and argues that those "clearly existed prior to May 19, 2014. Similarly, Vandermark refers to evidence from various treating sources wherein opinions were expressed that Vandermark is limited in her ability to keep pace and that her impairments are likely to cause absenteeism at work. Vandermark argues that VE Hurst's testimony was not useful because these additional limitations were not considered.

### 2. Commissioner's Response

The Commissioner responds that Vandermark's subjective and unsupported view that VE Hurst's testimony is intrinsically unreliable is

irrelevant. Rather, this was a case where expert (not lay) vocational testimony was necessary. The Commissioner argues that VE Hurst properly relied on the number of positions available in a broad occupational group when opining as to the incidence of illustrative jobs in the national and regional economy, even when a claimant can perform just one out of many in that broad occupational category. Finally, the Commissioner argues that the hypothetical question posed by ALJ Henrie to VE Hurst contained all the limitations recognized by ALJ Henrie, and, consequently, VE Hurst's response to that hypothetical question constitutes substantial evidence.[23]

C.    *Discussion*

1.    *Per Se* Error and Defective Hypothetical Question Arguments

The first and third prongs of Vandermark's challenge to the evidentiary sufficiency of VE Hurst's testimony can be addressed summarily. Undoubtedly, Vandermark's sedentary-to-light occupational base was eroded further, even profoundly, by her multitude of physical and mental limitations that precluded her from performing a full range of sedentary work, but a reviewing court has no basis to conclude, either as a matter of law or through judicial notice of facts, that Vandermark's limitations are so extensive as to preclude *all* forms of remunerative work. A prior decision within this district states succinctly that significant erosion of one's occupational base neither ends the inquiry, nor mandates a finding of disability. The court reasoned:

> SSR 96–9p specifically emphasizes that "a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.' " SSR 96–9p. Furthermore, the "mere inability to perform substantially all sedentary

---

[23]    The Commissioner's brief does not respond to Vandermark's other argument that VE Hurst's 20% reduction of occupational base was so arbitrary and unclear as to preclude a finding that it constituted substantial evidence.

unskilled occupations does not equate with a finding of disability. *There may be ... jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded." Id.*

*Colon v. Commissioner of Soc. Sec.*, No. 6:00CV0556 (GLS), 2004 WL 1144059, at *9 (N.D.N.Y. Mar. 22, 2004) (emphasis added).

Similarly, there is no requirement to declare VE Hurst's testimony of no use because it was given in response to a defective hypothetical question. For expert vocational opinion to constitute substantial evidence, a hypothetical question posed to the expert need only include all limitations found to be supported by medical evidence. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983) (Administrative law judge included in hypothetical question to the vocational expert witness all limitations *found to be established by the evidence*; thus, the expert witness's testimony constituted substantial evidence); *see also Calabrese v. Astrue*, 358 Fed. App'x 274, 276-277 (2d Cir. 2009) (summary order). The question posed by ALJ Henrie to VE Hurst contained all of the limitations recognized by ALJ Henrie in her residual functional capacity finding. That finding, as determined earlier, was valid and supported by substantial evidence. ALJ Henrie was not required to include all limitations found by her predecessor, ALJ Koennecke, or limitations found by treating sources after the relevant period at issue, or all limitations forensically advocated by Vandermark. Accordingly, VE Hurst's testimony, given in response to a valid hypothetical question, provided substantial evidentiary support for ALJ Henrie's Step 5 finding.

### 2.    Challenge to Incidence Evidence

The difficulty vocational experts face when formulating opinions regarding incidence of jobs in the national economy is well-articulated in *Brault v. Social*

*Sec. Admin.*, 683 F.3d 443, 446-448 (2d Cir. 2012). There, the governing circuit court of appeals noted that DOT lists occupations and establishes skill levels and exertional capacities required to perform those jobs. DOT codes, therefore, are useful for determining the type of work a disability applicant can still perform. DOT codes, however, just *define* jobs; they do not report *how many* such jobs are available in the economy. Thus, vocational experts must obtain additional information to assess whether positions exist for the occupations disability claimants can still perform.

In *Brault*, a vocational expert relied on *Occupational Employment Quarterly II*, which uses Standard Occupational Classification ("SOC") codes. *See* 683 F.3d at 446. Much like the Census Code system, it is "used by Federal statistical agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data." *See* Bureau of Labor Statistics, "Standard Occupational Classification," available at http://www.bls.gov/soc/ (last visited on Jan. 6, 2015). SOC codes encompass a broad grouping of jobs, and do not contain the same detailed occupational information (position descriptions) as DOT codes. Hence, one cannot infer that every job within a given SOC code has the same skill and exertional requirements, nor can one determine the incidence of available jobs for a single occupation within that code. The Second Circuit observed:

> . . . [A] VE must use some method for associating SOC-based employment numbers to DOT-based job types. The problem, however, is that DOT codes are much more granular than SOC codes— . . . there were nearly 13,000 job titles in the 1991 edition of the DOT, but only about 1,000 SOC titles.

*Brault*, 683 F.3d at 446.

### a.    *Judicial Treatment*

*Brault* noted that vocational experts' methods for associating SOC or similarly based employment numbers to DOT-based job types have been challenged.  In *Bayliss v. Barnhart,* 427 F.3d 1211, 1218 (9th Cir. 2005), the court brushed aside a claim that a vocational expert's methodology for deriving job incidence numbers was flawed by stating  simply that "[a] VE's recognized expertise provides the necessary foundation for his or her testimony. Thus, no additional foundation is required."  But, in *Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir. 2002), the court held that when  vocational expert's opinions are challenged, administrative law judges must make inquiry, similar but not necessarily identical to, Rule 702, Federal Rules of Evidence,[24] to find out whether purported experts' conclusions are reliable.  And, in a subsequent case, the Seventh Circuit added that vocational experts must make their data available on demand if challenged.  *See McKinnie v. Barnhart,* 368 F.3d 907, 911 (7th Cir. 2004).

*Brault* decided that the extent to which administrative law judges must test vocational experts' testimonies "is best left for another day and a closer case."  *Brault*, 683 F.3d at 450.  The decision, nevertheless, is instructive.  In

---

[24]     Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

closing commentary, the court agreed that evidence "conjured out of whole cloth" cannot be "substantial." *Id.* The court emphasized, however, that the deferential substantial-evidence standard is extremely flexible, and gives reviewing federal courts freedom to take a case-specific, comprehensive view of administrative proceedings, weighing all evidence to determine whether it is substantial. *Id.*, at 449. The court cited with apparent approval an earlier Second Circuit case, *Galiotti v. Astrue,* 266 Fed. App'x 66 (2d Cir. 2008) (summary order) wherein a claimant challenged a vocational expert's testimony because the expert was unable to fully explain how he arrived at the number of certain jobs in the economy. The expert, while not providing specific information the claimant wanted, identified the sources he generally consulted to determine such figures. The court noted the marked absence of any applicable regulation or decision requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation. It therefore affirmed on typical "substantial evidence" grounds. *Brault* then did the same, noting that the administrative law judge did not need to find specific numbers of jobs—all he was required to do was find that "substantial" positions exist. *Brault*, 683 F.3d at 450.

Similar reasoning was employed in *Dugan v. Commissioner of Soc. Sec.,* No. 2:10–CV–231, 2011 WL 2009465 (D. Vt. May 23, 2011). There, the court cited *Babb v. Astrue,* No. 2:10–cv–49–DBH, 2010 WL 5465839, at *4 (D. Me. Dec. 29, 2010), which quoted with approval the holding in *Pritchett v. Astrue,* No. 5:09–CV–144 (CAR), 2009 WL 4730326, at *3–4 (M.D. Ga. Dec. 4, 2009):

> It is enough that the vocational expert "used established and heretofore reliable methods and data and formed his professional opinions consistent with the methodology utilized by his contemporaries and other such professionals in relying upon sources, materials, and data that are not subject to further challenge until such time as either Congress or the Courts see fit to change them."

*Dugan v. Commissioner of Soc. Sec.,* 2011 WL 2009465, at *7.

The conundrum identified in *Brault* was a focal point in three additional cases, each of which affirmed the Commissioner's decision. First, in *Kennedy v. Astrue*, 343 Fed. App'x 719, 722, (2d Cir. 2009) (summary order), the court stated:

> . . .[A]lthough the vocational expert acknowledged that the data on which she relied in determining the existence of "charge-account clerk" positions (DOT number 205.367–014) also encompassed approximately 59 other DOT titles, *viewed in context, it is apparent that the expert arrived at her estimated figures for charge-account clerk positions by discounting from the total numbers for all 60 DOT titles.* Thus, the expert's testimony on this point did not introduce any *meaningful uncertainty* as to the number of charge account clerk positions available in the local or national economy. (emphasis added.)

Second, in *Fox v. Commissioner of Soc. Sec.*, No. 6:02–CV–1160 (FJS/RFT), 2009 WL 367628, at *3 (N.D.N.Y. Feb. 13, 2009), a vocational expert testified that he could not report the exact number of "surveillance system monitor" jobs available in the economy because no publication listed that figure, though surveys conducted by the Department of Labor and the State showed 132,980 "protective service occupation jobs" in the national economy and 200 in the Central New York region. The expert then stated that based upon his best estimate, the number of surveillance system monitor jobs was a "small percentage lower." Magistrate Judge Treece found that the number of jobs that the vocational expert identified, diminished by a small percentage, would still constitute a significant number of jobs. When reviewing objections to Judge Treece's report and recommendation, Judge Scullin concluded:

> . . . [A]lthough the VE could not testify to the exact number of surveillance system monitor jobs that was available, it was proper for him to rely on his experience to conclude that this number was a small percentage lower than the 132,980 Protective Service Occupation jobs in

the national economy and 200 of these jobs in the Central New York region.

*Fox*, 2009 WL 367628, at *3.

Third, in *Jones-Reid v. Astrue*, 934 F. Supp.2d 381 (D. Conn. 2012), a vocational expert testified that several jobs existed in the national economy that matched the claimant's hypothetical limitations. She gave DOT title codes for each, and expressed opinions regarding incidence numbers, nationally and statewide, for each. She testified that her opinions were based on her personal experience in performing labor market surveys, and a study on employer validation of jobs performed with a sit/stand option. She further testified that there were no written guidelines for determining the number of jobs that exist for particular DOT titles, and that there was no data source or methodology for reliably determining the number of jobs by DOT codes, but that the Bureau of Labor Statistics provides a starting point for the determination. She explained that she relied on her personal knowledge for over 60 percent of her determination as to the number of jobs in Connecticut, and for over 30 percent of her determination as to the number of jobs in the nation. Similarly, she relied on job surveys she personally performed for 60–70 percent of the determination as to the number of jobs in Connecticut, and 30–40 percent for the numbers of jobs in the nation. She did not provide a percentage determination, as to the number of jobs that were based on published statistical sources, but did identify several published sources that she relied on in formulating the job numbers, including a Department of Labor website, United States Department of Labor, Connecticut Department of Labor, "LES," salary surveys, professional organizations, regional job listings, labor market surveys, employer sampling, situational assessments, informational interviews, and the Standard Occupational Classification. The court concluded:

The VE utilized reliable statistical sources as well personal knowledge and experience to develop the occupational projections provided. While the VE did not provide a step-by-step description of the methodology used, this Court cannot say that the ALJ erred in accepting the VE's testimony as reliable, as there was a sufficient basis for the ALJ to so find.

*Id.*, at 407.

The Commissioner's scorecard is not perfect, however. In both *Rosa v. Colvin* and *Johnston v. Barnhart*,[25] the Commissioner's decisions were reversed for lack of substantial evidence supporting the administrative law judges' Step 5 findings based on vocational experts' testimonies regarding incidence of jobs that the respective claimants could perform. In each instance, the vocational expert relied on incidence data for broad occupational groups that included positions other than those the claimant could perform. And, in each instance, the vocational expert offered no opinion as to how many positions existed for the jobs that the claimant could perform.

Finally, in two recent cases from within this district, the Commissioner's decisions were again reversed because expert vocational testimonies were insufficient to support findings that a significant number of jobs existed in the national economy. In both *Marvin v Colvin* and *Decker v Commissioner of Soc. Sec.*,[26] a vocational testified that a person with the claimants' limitations could perform certain jobs, and opined as to the number of jobs available for each occupation nationally and regionally. Those numbers, however, pertained to a broad range of positions, including jobs that the claimants could not perform

---

[25]     *Rosa v. Colvin,* No. 3:12-CV-0170, 2013 WL 1292145, at *9-10 (N.D.N.Y. Mar. 27, 2013); *Johnston v. Barnhart,* 378 F. Supp.2d 274, 283 (W.D.N.Y. 2005).

[26]     *See Decker v. Astrue,* No. 3:13-cv-662 (GLS), 2014 WL 2176960, at *6 (N.D.N.Y. May 22, 2014); *Marvin v. Astrue,* No. 3:12-cv-1779 (GLS), 2014 WL 1293509, at *10 (N.D.N.Y. Mar. 31, 2014).

based on their residual functional capacities. The administrative law judge relied on that testimony in each instance to determine that the claimants were capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Citing *Rosa* in both cases, the court concluded that the vocational experts' testimonies were unclear as to the number of jobs available to claimants in the local or national economy, and held in each instance that the vocational expert's testimony did not constitute substantial evidence. In *Marvin*, the court clarified and amplified a specific evidentiary flaw: lack of vocational expert testimony accounting for the fact that Occupational Employment Statistics (OES) codes—the source that provided the number of jobs available—included more jobs than the claimants could actually perform, and that the vocational expert adjusted the number of jobs available accordingly. 2014 WL 1293509, at *10.

b. *Distillation*

In absence of a definitive statement from the governing circuit court of appeals, lower courts must formulate and apply their own standards for assessing sufficiency of job-incidence testimony provided by vocational expert witnesses, guided but not necessarily governed by what other courts addressing similar issues decided.

Decisions surveyed in the preceding section generally give great deference to experience and expertise, but not opinion evidence connected to existing data only by the *ipse dixit* of the expert. Courts do not require vocational experts to have and employ precise data-matching algorithms for associating Census Code, SOC-based or similar employment numbers to DOT-based job types because DOT-specific job numbers simply do not exist. As one circuit court of appeals observed:

> There apparently is no data, updated on a regular basis, available through either a public or private source[ ], that reports numbers of jobs by DOT code number. . . . Thus, if we required a VE to produce job statistics specific to the DOT-coded occupations a claimant can perform, it is unlikely that the Commissioner would ever succeed in satisfying her burden. This cannot be the result the regulations intend. . . . [W]e decline to impose impossible burdens on the VE.

*Guiton v. Colvin*, 546 Fed. App'x 137, 142-142 (4th Cir. 2013) (internal citations and quotations omitted).  Consequently, courts tolerate to a considerable extent inexact matching, data loss and methodologies not considered "scientific" within the meaning of Rule 702 of the Federal Rules of Evidence.

Courts generally accept as substantial evidence imprecise vocational expert opinions formed consistent with the methodology utilized by their professional contemporaries and based upon sources, materials and data generally deemed reliable. "Experience" may provide the necessary foundation for vocational experts' testimony, especially when the record reflects that they personally performed actual market surveys or placed substantial numbers of clients within the jobs they identified as matching claimants' residual functional capacities.  Courts balk, however, when vocational experts provide incidence testimony based on broad occupation groupings without accounting for the fact that such groupings include more jobs that a particular claimant can perform, without adjusting those incidence numbers accordingly or when they otherwise inject meaningful uncertainty as to how adjustments are made.

c.    *Application*

At the time of the hearing, VE Hurst had practiced his profession for over 21 years.  During that time, he personally placed clients in jobs that he opined that Vandermark could perform with her residual functional capacity, although, perhaps, not all.  His opinion regarding incidence of those jobs was formed in

reliance on standard statistical publications, cross-referenced with practitioners' computer software, collaboration with other professional colleagues, and twice-yearly personal adjustments to take account of market factors such as unemployment. He identified those sources, and submitted to full cross-examination.

VE Hurst acknowledged that because published data on which he relied "does a lot of grouping," he needed to "factor out specific jobs." He then reduced those reported incidence numbers by 25% for light-exertion unskilled jobs and 20% for sedentary-exertion unskilled jobs due to Vandermark's extensive limitations as posed in ALJ Henrie's hypothetical question.[27] He did not articulate any formula or other basis for calculating these percentages, apparently relying on his experience to make a best estimate.

VE Hurst's methodology fits within the rubric of what courts considering this issue have determined to provide a foundation for testimony rising to the level of substantial evidence. Critically, VE Hurst accounted for the fact that the statistical groupings on which he relied included more jobs than a person with Vandermark's limitations can perform, and he adjusted those incidence numbers accordingly. While his adjustments were not made through application of formal theory or use of mechanical or technological aids, VE Hurst's panoptic experience permitted him to form a reliable opinion based on judgment, instinct and effort.

---

[27] The transcript of VE Hurst's testimony regarding incidence of light unskilled jobs that a person with Vandermark's residual functional capacity can perform reads as follows : "And I would reduce the numbers not those due to the hypothetical by 25 percent." (T. 1114)(underscoring added). Because the words "not those" are nonsensical in context, and because the transcript of VE Hurst's testimony later reflects clearly that he reduced job incidence numbers due to "limitations set forth in the hypothetical," the undersigned considers the words "not those" to be a scrivener's error.

Because VE Hurst's testimony could reasonably be accepted, Vandermark's argument that the Commissioner did not sustain her evidentiary burden at Step 5 of sequential evaluation must be rejected.

## VII. Third Point

Vandermark's last point of error is that ALJ Henrie violated applicable regulations and her constitutional right to Due Process by allowing VE Hurst to testify telephonically over Vandermark's objection. (Dkt. No. 14, pp. 23-25). In this case, the pre-hearing notice stated that a named vocational expert would be physically at the hearing; however, on the day of hearing, ALJ Henrie notified Vandermark that a different expert, VE Hurst, would be testifying, and would do so *via* telephone. (T. 1075). Vandermark objected but her objection was overruled. (T. 1075-76).

*A.    Argument & Response*

Vandermark argues that the regulation governing evidentiary hearings at the time of her hearing in September 2012 did not permit witness telephonic testimony without prior notice or over a claimant's objection. (Dkt. No. 14, p. 23). Vandermark maintains that being forced to proceed with the hearing without prior notice and consent was a harmful error affecting substantial rights. Specifically, Vandermark argues that her ability to properly cross-examine VE Hurst was hampered by inability to do so in person; that cross examination likely could have been more effective if done in person; and that counsel and ALJ Henrie would have had opportunity to assess VE Hurst's demeanor in a matter where the expert's testimony was a crucial basis for denying Vandermark's benefits and, in Vandermark's view, questionable. (Dkt. No. 14, pp. 24-25).

The Commissioner's response contends that allowing VE Hurst to testify telephonically, if error, was harmless because Vandermark neither alleges nor demonstrates specific prejudice emanating therefrom. (Dkt. No. 16, p. 12-13).

## B.  Discussion

Social Security Administration regulations in effect when Vandermark's claim came on for hearing provided that claimants would "be told if [the] appearance . . . of any other party or witness is scheduled to be made by video teleconferencing rather than in person." 20 C.F.R. §§ 404.938(b), 416.1438(b).[28] When notice was given, regulations required further that it indicate "that the scheduled place for the hearing is a teleconferencing site and explain what it means to appear at [the] hearing by video teleconferencing." *Id*. Finally, claimants were to be provided directions on how to object and request in-person hearings. *See id*.

The governing circuit court of appeals has not decided whether a violation of these regulations implicates constitutional Due Process or otherwise constitutes reversible error, and there is a split among the district courts in this Circuit on this issue.[29] The Second Circuit has, however, applied harmless-error analysis in *Henry v. Colvin*, 561 Fed. App'x 55, 57-58 (2d Cir. 2014) (summary order). There, the Second Circuit found harmless error when a claimant's counsel suffered from no technical difficulties or time constraints that limited effectiveness of his cross-examination, and on appeal claimant alleged no specific prejudice. 561 Fed. App'x 55, 57-58 (2d Cir. 2014) (summary order). *Henry* is not directly on point because the claimant's counsel in that case stated no timely

---

[28]    SSA regulations effective June 20, 2013 now permit telephonic testimony. *See* 20 C.F.R. §§ 404.936(c), 416.1436(c) (2013).

[29]    *See Marvin*, 2014 WL 1293509, at *9 n.10 (comparing cases).

objection to the expert's telephonic testimony. Nevertheless, it lends support to the Commissioner's argument that this type of procedural aberration will not require reversal absent a showing of prejudice emanating therefrom.[30]

Similarly, a prior decision of this court predating *Henry* affirmed the Commissioner's decision notwithstanding a prior-notice-and-consent violation on the basis of harmless error when a claimant's counsel extensively examined the vocational expert, and was not restricted in cross examination. *See Palaschak v. Astrue*, No. 08-cv-1172 (GLS), 2009 WL 6315324, at *12 (N.D.N.Y. Nov. 18, 2009) ("Plaintiff's counsel, while having adequately and competently placed the objection on the record, was able to extensively cross-examine the VE and was not restricted in his questioning by the ALJ. . . . Thus, the Court recommends affirming the ALJ decision on the basis that the Plaintiff cannot demonstrate that the error more than harmless.").

Vandermark neither alleges nor shows specific prejudice. Vandermark was represented by an experienced attorney; no technical difficulties diminished effectiveness of cross-examination; and no time constraints were put on counsel's cross-examination. It is pure speculation to suggest that ALJ Henrie might have assessed VE Hurst's testimony differently by personal observation of his demeanor. Under these circumstances, the error was harmless.

## VIII.   Conclusion and Recommendation

Susan Vandermark has pursued claims for disability-based benefits available under the Social Security Act for almost a decade. She attended and participated in three administrative evidentiary hearings in Florida, New York,

---

[30]    The Second Circuit did not determine this was a due process violation. Instead, the Court noted "even assuming, without deciding, that the vocational expert's testimony by telephone was inconsistent with due process and SSA regulations as they existed at the time of Henry's 2009 remand hearing, the error was harmless." *Henry*, 561 Fed. App'x at 57-58 & n.1.

and Utah, and has instituted two actions in federal district court under 42 U.S.C. § 405(g). Along the way, she secured a partially-favorable determination that entitled her to receive benefits commencing four and a half years ago on May 19, 2010.

Her current action challenges the Commissioner's decision that she was not disabled during the period commencing August 15, 2005, and continuing through May 18, 2010. The Commissioner's decision denying benefits for that period is supported by substantial evidence and based on application of correct principles of law. Accordingly, it should be **AFFIRMED**.

## IX.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___7___ day of ___January___ 2015.

_Earl S. Hines_

Earl S. Hines
United States Magistrate Judge